IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TOI R. HOWARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 11-716 |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

**INTRODUCTION**

Plaintiff, Toi R. Howard, seeks judicial review of a decision of Defendant, Commissioner of Social Security ("the Commissioner"), denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. Presently before the Court are the parties' cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, Plaintiff's motion for summary judgment will be denied, and the Commissioner's cross-motion for summary judgment will be granted.

**PROCEDURAL HISTORY**

Plaintiff filed an application for SSI on March 31, 2008, alleging disability since March 17, 2006, due to fibromyalgia, depression and herniated discs.[1]  (R. 113-14, 126).  Plaintiff's application was denied and she requested a hearing before an administrative law judge ("ALJ").  (R. 43-47, 61).  Plaintiff, who was represented by counsel, testified at the hearing which was held on April 21, 2010.  A vocational expert ("VE") also testified.  (R. 21-40).

The ALJ issued a decision on May 12, 2010, denying Plaintiff's application for SSI based on his determination that, despite her physical and mental impairments, Plaintiff retained the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy.[2]  (R. 10-18).  Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on April 21, 2011.  (R. 1-5).  Thus, the ALJ's decision became the final decision of the Commissioner.  This appeal followed.

---

[1] Although Plaintiff claims that she has been disabled and unable to engage in substantial gainful activity since a work-related injury on October 18, 2002, the Court notes that SSI is not payable prior to the month following the month in which a claimant files an application.  See 20 C.F.R. § 416.335.
[2] The Social Security Regulations define RFC as the most a disability claimant can still do despite his or her physical or mental limitations.  See 20 C.F.R. § 416.945(a).

**BACKGROUND**

Plaintiff's testimony during the hearing before the ALJ may be summarized as follows:[3]

Plaintiff was born on October 27, 1959.  At the time of the hearing, Plaintiff was living with her fiancé and 10-year old son.  With respect to education, Plaintiff completed the tenth grade and obtained a GED.  Plaintiff also obtained a nursing assistant/home health aide certificate from the Community College of Allegheny County, Pennsylvania.  (R. 25-26).  In the past, Plaintiff worked as a nursing assistant at two hospitals and as a home health aide.  Plaintiff has not worked since October 18, 2002, when she sustained a back injury while lifting a patient.[4]  (R. 26-27).

Plaintiff sees her primary care physician ("PCP") once a month for treatment of low back pain that radiates down her left leg and fibromyalgia.[5]  On a daily basis, she takes Vicodin and

---

[3] In addition to Plaintiff's testimony during the hearing before the ALJ, counsel submitted statements from her daughter, her sister and a friend in support of her application for SSI.  (R. 153-57).

[4] In the undated Disability Report completed by Plaintiff in connection with her application for SSI, Plaintiff indicated that she worked as a nursing assistant in a hospital or as a home health aide from 1985 to 2002.  (R. 127).  The Court notes, however, that a review of Plaintiff's earnings record for 1999 through 2002 shows minimal earnings in 1999, 2001 and 2002 and no earnings in 2000.  (R. 116-17).

[5] Fibromyalgia makes you feel tired and causes muscle pain and "tender points." Tender points are places on the neck, shoulders, back, hips, arms or legs that hurt when touched.  People with fibromyalgia may have other symptoms, such as trouble sleeping, morning stiffness, headaches, and problems with thinking and memory, sometimes called "fibro fog."  No one knows what causes fibromyalgia.  Anyone can get it, but it is most common in middle-aged women. There is no cure for fibromyalgia, but medicines can help you manage your

3

Motrin for pain management and Flexeril for muscle spasms.[6] Plaintiff's PCP has instructed her to do exercises and apply heat to relieve the back pain. He has not, however, referred Plaintiff to physical therapy or to an orthopedic or pain management specialist. (R. 28-31). Plaintiff attends counseling sessions for depression at Mercy Behavioral Health every two weeks. (R. 28).

Plaintiff spends most of her time at home. She showers and gets dressed only 4 or 5 days a week. Plaintiff does not drive and rarely takes a bus. She does not attend church or social events. When Plaintiff goes grocery shopping, which is very seldom, she is taken by her daughter or a neighbor. Plaintiff's ability to cook, clean and do laundry depends on her pain level, which is significant 5 out of 7 days a week. Plaintiff is able to walk 20 minutes before she needs to rest; she can sit 20 to 25 minutes before she needs to change positions; she was instructed by her PCP not to lift anything weighing more than 30 pounds; she has difficulty bending; she rests 2 to 3 hours a day for about an hour; she has some difficulty concentrating; and she is irritable and moody. (R. 31-35).

---

symptoms. Getting enough sleep and exercising may also help. www.nlm.nih.gov/medlineplus ("MedlinePlus").

[6] Vicodin, or hydrocodone, is used to relieve moderate to severe pain. It is in a class of medications called opiate (narcotic) analgesics. Motrin, or ibuprofen, is used to relieve mild to moderate pain. Flexeril is a muscle relaxant used with rest, physical therapy and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains and other muscle injuries. MedlinePlus.

**VE Testimony**

During the hearing on Plaintiff's application for SSI, the
ALJ asked the VE to assume a hypothetical person of Plaintiff's
age, education and work experience who can perform light work
with the following restrictions:[7] (1) the need for a sit/stand
option; (2) only simple instructions; (3) no face-to-face
interaction with the general public, close interaction with co-
workers, intensive supervision, changes in the work setting or
assembly line pace; (4) only occasional postural activities; and
(5) standing only 4 hours during an 8-hour work day.  The ALJ
then asked the VE whether the hypothetical person could perform
any jobs existing in significant numbers in the national
economy.  The VE responded affirmatively, identifying the jobs
of an electronic worker, a garment sorter and a ticketer.  (R.
36-37).  If, in addition, the hypothetical person needed to take
a 15-minute break every 1½ hours during the work day to rest or
would miss 3 to 6 days of work a month due to his or her
impairments, the VE testified that all jobs would be eliminated.
(R. 38-39).

---

[7] Under the Social Security Regulations, "light work" involves "lifting no more
than 20 pounds at a time with frequent lifting and carrying of objects
weighing up to 10 pounds.  Even though the weight lifted may be very little,
a job is in this category when it requires a good deal of walking or
standing, or when it involves sitting most of the time with some pushing or
pulling of arm or leg controls."  20 C.F.R. § 416.967.

**MEDICAL EVIDENCE**

In summary, the administrative record in this case includes the following medical evidence:[8]

Plaintiff's initial evaluation by Dr. Peter Tanzer, her PCP, was performed on May 24, 2007. Plaintiff reported activity intolerance and difficulty climbing stairs due to back and radicular pain. Plaintiff's physical examination revealed paraspinal muscle spasm in her lumbar spine and a positive straight leg raise ("SLR") test,[9] but no motor deficit. Dr. Tanzer's assessment was low back and radicular pain with lumbar disc disease. At the time, Plaintiff was taking Vicodin and Motrin for pain, and Dr. Tanzer added Flexeril to her medications. (R. 237).

During an office visit with Dr. Tanzer on June 26, 2007, Plaintiff presented with increasing low back pain radiating into her left leg with positive SLR and limited range of motion ("ROM"). Dr. Tanzer added Prednisone to Plaintiff's medications.[10] (R. 237).

---

[8] As noted by the Commissioner, in the brief filed in support of her motion for summary judgment, Plaintiff does not challenge the ALJ's assessment of her mental impairment. Therefore, any issue arising out of this assessment has been waived. (Docket No. 12, p. 4, fn. 2). Accordingly, the Court's summary does not include the evidence pertaining to Plaintiff's treatment for depression and the evaluations related thereto.

[9] In the SLR test, you lie on your back and the doctor lifts your affected leg. Your knee stays straight. If you feel pain down your leg and below your knee, you test positive for a herniated disk. http://orthoinfo.aaos.org

[10] Prednisone, a corticosteroid, is used to treat, among other things, certain types of arthritis. MedlinePlus.

Plaintiff's next office visit with Dr. Tanzer occurred on March 10, 2008, more than 8 months later.  Dr. Tanzer's assessment was the same: increasing low back pain radiating into the left leg with positive SLR.  Plaintiff was instructed to continue taking Vicodin and Motrin, and he prescribed Flexeril for Plaintiff again.  (R. 237).  Following an office visit three months later (June 3, 2008), Dr. Tanzer reported that Plaintiff's pain management was stable on Vicodin and Motrin. (R. 237).

On June 5, 2008, Plaintiff underwent a consultative disability examination by Dr. Hadi Firoz.  With respect to history, Plaintiff reported that she had suffered from significant low back pain with radiculopathy since a work-related injury in 2002; that the pain was eased "somewhat" by Vicodin; that her pain level was a 10 on a scale of 1 to 10, even as she sat in a chair during the interview; and that she smoked ½ pack of cigarettes a day.  With regard to Plaintiff's physical examination, Dr. Firoz noted that Plaintiff was "sitting comfortably in chair, able to get up from the chair without difficulty, walks to the examination table, gets on the table without any difficulty."  Dr. Firoz also noted that Plaintiff did not use an assistive device to walk; she exhibited full ROM in her extremities; she had trigger point tenderness in the upper back, anterior chest and elbows, as well as tenderness

7

along the sacroiliac joint; her motor strength in the upper and
lower extremities was 5/5 bilaterally; and her gait was normal.
Dr. Firoz assessed Plaintiff with lower back pain; however, he
described Plaintiff's reported pain level as "somewhat
unrealistic."  The doctor's other assessments included
fibromyalgia, depression, nicotine dependence and
osteoarthritis.  (R. 167-70).

In a Medical Source Statement of Plaintiff's ability to
perform work-related physical activities completed the day of
the consultative examination, Dr. Firoz rendered the following
opinions: Plaintiff could frequently lift 20 pounds and
occasionally lift 25 pounds; she could stand and walk for 4
hours in an 8-hour work day; she could sit for 8 hours in an 8-
hour work day with a sit/stand option; her ability to push and
pull was unlimited; she could occasionally bend and kneel and
frequently stoop, crouch, balance and climb; and she had no
other physical or environmental limitations.  (R. 163-64).

Also in June 2008, Dr. Cheryl Berko, a non-examining State
agency medical consultant, completed a physical RFC assessment
for Plaintiff based on a review of her file.  In Dr. Berko's
opinion, Plaintiff could occasionally lift and carry 20 pounds
and frequently lift and carry 10 pounds; she could stand and/or
walk about 6 hours in an 8-hour work day; she could sit about 6
hours in an 8-hour work day; her ability to push and pull with

the upper and lower extremities was unlimited; and she had no postural, manipulative, visual, communicative or environmental limitations. (R. 181-84).

On June 26, 2008, Plaintiff presented to Dr. Tanzer due to a flare-up of asthma "without precipitating factors other than tobacco abuse." The doctor stressed Plaintiff's need to stop smoking.[11] As to Plaintiff's low back and radicular pain, Dr. Tanzer noted that she continued to be stable on Vicodin and Motrin. (R. 237).

Following an office visit on August 21, 2008, Dr. Tanzer added fibromyalgia and depression to Plaintiff's assessment. The doctor prescribed Neurontin for Plaintiff's fibromyalgia,[12] and he continued to describe Plaintiff's pain management as stable on Vicodin and Motrin with no lethargy or mental status change. (R. 238).

Plaintiff's assessment and treatment remained the same during an office visit with Dr. Tanzer on September 22, 2008. However, during Plaintiff's office visit on October 23, 2008, Dr. Tanzer indicated that Neurontin would be discontinued because Plaintiff was experiencing headaches. (R. 239). Following office visits on November 17, 2008 and December 24,

---

[11] With respect to Plaintiff's diagnosis of asthma, the Court notes that Plaintiff has not challenged the ALJ's finding that this impairment does not rise to the level of a severe impairment. (R. 11).

[12] Neurontin is used to control seizures in people who have epilepsy, relieve the pain of post-herpetic neuralgia and treat restless leg syndrome. It is in a class of medications called anticonvulsants. MedlinePlus.

2008, Dr. Tanzer's assessment and treatment of Plaintiff's conditions remained the same.  (R. 235).

On February 27, 2009, Dr. Tanzer performed an overall evaluation of Plaintiff for neck and knee pain, shortness of breath, tachycardia, arthralgias and fatigue.  Plaintiff continued to smoke ½ pack of cigarettes a day, and she continued to take Vicodin, Motrin and Flexeril for pain management.  In his assessment, Dr. Tanzer noted that Plaintiff presented with a bilateral wheeze, and he stressed again the need for Plaintiff to stop smoking.  As to tachycardia, Dr. Tanzer noted that Plaintiff's EKG revealed sinus tachycardia with no complex ectopy, dizziness, loss of consciousness or complete heart blockage.  With regard to arthralgias in Plaintiff's neck, knees, shoulders and hips, Dr. Tanzer noted no inflammation, joint laxity or effusion.  In addition, bilateral knee x-rays failed to reveal any fractures, lesions, bony erosion or significant degenerative joint disease.  Finally, Dr. Tanzer noted that Plaintiff continued to suffer from chronic lumbar pain with no new radiculopathy or incontinence.  Dr. Tanzer stressed the importance of stretching and strengthening exercises.  (R. 236).

During a follow-up visit with Dr. Tanzer on May 14, 2009, two and a half months later, Plaintiff continued to report low back pain radiating into her left leg which was exacerbated by

10

cold weather.  With regard to pain management, Dr. Tanzer noted
that Plaintiff was stable on Vicodin and Motrin without
lethargy, altered reaction time or mental status change.  As to
Plaintiff's asthma, Dr. Tanzer noted that she continued to smoke
and used a Proventil inhaler.[13]  Dr. Tanzer also noted that
Plaintiff could not take Neurontin for her fibromyalgia because
it caused headaches.  With the exception of increased
cholesterol, Plaintiff's blood tests were negative.  Dr. Tanzer
stressed the importance of diet to Plaintiff.  (R. 234).

Following an office visit a month later (June 11, 2009),
Dr. Tanzer entered the same notes in Plaintiff's chart that he
had entered following the previous visit.  (R. 234).  Moreover,
the only change in Dr. Tanzer's office notes following
Plaintiff's visits on July 14, August 7, August 24, September
21, October 19, November 20, December 18, 2009, January 15,
February 12, March 12 and April 9, 2010, is a notation that she
was taking Neurontin again for fibromyalgia.  (R. 233).

On March 3, 2010, Dr. Tanzer prepared a report concerning
his treatment of Plaintiff at the request of her counsel.  Dr.
Tanzer noted that Plaintiff had been under his care for pain
management since May 2007; on exam, Plaintiff showed evidence of

---

[13] Proventil is used to prevent and treat wheezing, difficulty breathing and
chest tightness caused by lung diseases such as asthma and chronic
obstructive pulmonary disease.  It is in a class of medications called
bronchodilators.  It works by relaxing and opening air passages to the lungs
to make breathing easier.  MedlinePlus.

paraspinal muscle spasm and pain radiating into the left leg
which is worsened by ambulation and cold weather; despite the
use of Vicodin and Motrin, Plaintiff continued to suffer from
persistent back and radicular pain limiting her daily
activities; past treatment with Neurontin and Flexeril failed;
Plaintiff used a bronchodilator for asthma and continued to
attempt to stop smoking; and although somewhat impaired by her
shortness of breath, Plaintiff had not experienced repeated
hospitalizations or ER visits and did not require
corticosteroids.  As to physical capacities, Dr. Tanzer opined
that Plaintiff requires frequent periods of sitting during an
average day; she is able to stand and walk for 1 to 2 hours
before needing a break; she can sit for 3 hours before requiring
a break; she is able to lift and carry 15 to 20 pounds; her
ability to bend, squat, crawl and climb is limited secondary to
her lumbar strain; she had shown no improvement over the 2 to 3
years he had treated her; she would have difficulty working a
full 8-hour day because of the need for frequent rests; and she
would likely miss 3 to 6 days of work a month due to her medical
conditions.  (R. 208).

**ALJ'S DECISION**

        In order to establish a disability under the Social
Security Act, a claimant must demonstrate an inability to engage
in any substantial gainful activity due to a medically

determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months.  See 42

U.S.C. § 423(d)(1).  A claimant is considered unable to engage

in any substantial gainful activity only if her physical or

mental impairment or impairments are of such severity that she

is not only unable to do her previous work but cannot,

considering her age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the

national economy.  See 42 U.S.C. § 423(d)(2)(A).

When presented with a claim for disability benefits, an ALJ

must follow a sequential evaluation process.  See 20 C.F.R.

§ 416.920(a)(4).  The process was described by the Supreme Court

in Sullivan v. Zebley, 493 U.S. 521 (1990), as follows:

                    *    *    *

     Pursuant to his statutory authority to implement the
SSI Program, (footnote omitted) the Secretary has
promulgated regulations creating a five-step test to
determine whether an *adult* claimant is disabled.  Bowen v.
Yuckert, 482 U.S. 137, 140-42 (1987).  (footnote omitted).
The first two steps involve threshold determinations that
the claimant is not presently working and has an impairment
which is of the required duration and which significantly
limits his ability to work.  See 20 C.F.R. §§ 416.920(a)
through (c)(1989).  In the third step, the medical evidence
of the claimant's impairment is compared to a list of
impairments presumed severe enough to preclude any gainful
work.  See 20 C.F.R. pt. 404, subpt. P, App. 1 (pt.
A)(1989).  If the claimant's impairment matches or is
"equal" to one of the listed impairments, he qualifies for
benefits without further inquiry.  § 416.920(d).  If the
claimant cannot qualify under the listings, the analysis

proceeds to the fourth and fifth steps.  At these steps,
the inquiry is whether the claimant can do his own past
work or any other work that exists in the national economy,
in view of his age, education, and work experience.  If the
claimant cannot do his past work or other work, he
qualifies for benefits.

                              *    *    *

493 U.S. at 525-26.

The claimant bears the burden of establishing steps one
through four of the sequential evaluation process for making
disability determinations.  At step five, the burden shifts to
the Commissioner to consider "vocational factors" (the
claimant's age, education and past work experience) and
determine whether the claimant is capable of performing other
jobs existing in significant numbers in the national economy in
light of his or her RFC.  Ramirez v. Barnhart, 372 F.2d 546,
550-51 (3d Cir.2004).

With respect to the ALJ's application of the five-step
sequential evaluation process in the present case, steps one and
two were resolved in Plaintiff's favor: that is, the ALJ found
that Plaintiff had not engaged in substantial gainful activity
since she filed her application for SSI on March 31, 2008, and
the medical evidence established that Plaintiff suffers from the
following severe impairments: degenerative lumbar disc disease,

status post discectomy with chronic low back pain,[14] fibromyalgia
and major depressive disorder.  (R. 11).

Turning to step three, the ALJ found that Plaintiff's
impairments were not sufficiently severe to meet or equal the
requirements of any impairment listed in 20 C.F.R., Pt. 404,
Subpt. P, App. 1.  (R. 11-12).

Before proceeding to step four, the ALJ assessed
Plaintiff's RFC, concluding that Plaintiff retained the RFC to
perform light work, except that (1) she must be afforded a
sit/stand option at will to relieve back pain and stiffness, (2)
she is limited to standing 4 hours during an 8-hour work day,
(3) she can only occasionally stoop, crouch, crawl, climb,
balance and kneel, (4) she is limited to jobs involving simple
instructions, (5) she cannot work in crowds or with groups of
people, (6) she is unable to tolerate intensive supervision, and
(7) she should not be required to adapt to significant changes
in the work setting.  (R. 12).  The ALJ then proceeded to step
four, finding that in light of Plaintiff's RFC, she is unable to
perform any of her past work.  (R. 16).

Finally, at step five, considering Plaintiff's age,
education, work experience, RFC and the VE's testimony, the ALJ
found that Plaintiff could perform other work existing in

---

[14] The Court notes that there is no evidence in the record supporting the ALJ's
finding that Plaintiff is "status post discectomy."  Treatment of Plaintiff's
chronic back pain has been limited to medication, exercises and application
of heat.

significant numbers in the national economy, including the jobs of an electronics worker, a garment sorter and a ticketer. (R. 16-17).

**STANDARD OF REVIEW**

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It consists of something more than a mere scintilla, but something less than a preponderance. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have decided the case differently, it must accord deference to the Commissioner and affirm the findings and decision if supported by substantial evidence. Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir.1986).

**DISCUSSION**

In support of her motion for summary judgment, Plaintiff asserts the ALJ erred (1) by failing to give substantial weight to the opinion of Dr. Tanzer, her PCP, regarding her physical work-related limitations, (2) by giving significant weight to the opinion of Dr. Firoz who performed the consultative examination and assessed Plaintiff's physical RFC without the benefit of a full record, and (3) by failing to include all of

the limitations caused by Plaintiff's physical impairments in
her RFC which resulted in an inadequate hypothetical question to
the VE.   After consideration, the Court finds Plaintiff's
arguments unpersuasive.

Turning first to the weight accorded Dr. Tanzer's opinion
by the ALJ, as noted by Plaintiff (Docket No. 10, p. 8), a
cardinal principle guiding disability eligibility determinations
is that the ALJ accord treating physicians' reports great
weight, especially "when their opinions reflect expert judgment
based on a continuing observation of the patient's condition
over a prolonged period of time."[15]   Plummer v. Apfel, 186 F.3d
422, 429 (3d Cir.1999), *quoting* Rocco v. Heckler, 826 F.2d 1348,
1350 (3d Cir.1987).   In fact, if a treating source's opinion on
the issues of the nature and severity of a claimant's
impairments is well-supported by medically acceptable clinical
and laboratory diagnostic techniques and is not inconsistent
with other substantial evidence in the case, it is entitled to
controlling weight.   20 C.F.R. § 416.927(d)(2).

In the present case, the Court is compelled to conclude
that the ALJ adequately explained his reasons for rejecting Dr.

---

[15]In this connection, the Social Security Regulations provide that, generally,
an ALJ is to give more weight to the opinions of a claimant's treating
sources "since these sources are likely to be the medical professionals most
able to provide a detailed, longitudinal picture of [a claimant's] medical
impairment(s) and may bring a unique perspective to the medical evidence that
cannot be obtained from the objective medical findings alone or from reports
of individual examinations, such as consultative examinations or brief
hospitalizations."   20 C.F.R. § 416.927(d)(2).

Tanzer's opinion concerning Plaintiff's work-related physical limitations.  First, the ALJ noted that Dr. Tanzer consistently reported Plaintiff's low back and radicular pain as stable on medication,[16] and there were minimal clinical findings by Dr. Tanzer to support his opinion of disability.  Rather, it is apparent from his office notes that Dr. Tanzer relied, in large part, on Plaintiff's subjective report of symptoms.

Second, the ALJ noted that Dr. Tanzer is not an orthopedic specialist or a pain management specialist, and he never referred Plaintiff to such specialists.  In fact, Dr. Tanzer never ordered a single diagnostic test for Plaintiff's longstanding complaints of back pain or referred Plaintiff for physical therapy.  Instead, his treatment of Plaintiff since her initial evaluation in May 2007 was conservative, consisting entirely of medication management and exercise recommendations.

Third, the ALJ noted that the consultative physical examination of Plaintiff by Dr. Firoz revealed full ROM in her extremities, normal neurological function and the ability to move about comfortably, undermining Dr. Tanzer's opinion of disability.  (R. 13-15).  In sum, the weight accorded Dr. Tanzer's opinion of Plaintiff's physical work-related limitations by the ALJ was supported by substantial evidence.

---

[16] The Court also notes there is no evidence that Plaintiff suffers any side effects from the medications prescribed by Dr. Tanzer for pain management.

As to Plaintiff's objection to the ALJ's decision to attribute greater weight to Dr. Firoz's opinion of her physical RFC, than to Dr. Tanzer's opinion, she cites <u>Brownawell v. Commissioner</u>, 554 F.3d 352 (3d Cir.2008), in support.  However, Plaintiff's reliance on <u>Brownawell</u> is misplaced.

In <u>Brownawell</u>, the Court of Appeals held that an ALJ's decision to deny benefits was improper because "he relied on facts that were clearly erroneous in making a decision that failed to give appropriate weight to the opinion [of the] treating physician."  554 F.3d at 355.  Unlike <u>Brownawell</u>, Plaintiff has failed to identify any "erroneous facts" on which the ALJ relied to reject Dr. Tanzer's opinion that she is unable to work due to her physical impairments.  Rather, Plaintiff relies on the fact that the consultative examination by Dr. Firoz was performed approximately 22 months before the hearing on Plaintiff's application for SSI; therefore, Dr. Firoz did not have the benefit of the full record prior to rendering his opinion concerning Plaintiff's physical RFC.  After consideration, the Court finds this objection meritless.

As noted by the Commissioner, all of Dr. Tanzer's notes relating to Plaintiff's office visits between the consultative examination performed by Dr. Firoz in June 2008 and the hearing before the ALJ in April 2010 were essentially the same.  (Docket No. 12, p. 10).  Plaintiff's treatment was limited to medication

management and recommendations of exercise, and she was consistently described as stable.  Simply put, there is nothing in the office notes of Dr. Tanzer following the consultative examination to undermine Dr. Firoz's opinion regarding Plaintiff's physical RFC.

Finally, because the Court concludes the ALJ was entitled to reject Dr. Tanzer's opinion regarding Plaintiff's physical RFC based on the medical evidence, Plaintiff's third objection to the ALJ's decision, i.e., that the VE's testimony does not constitute substantial evidence supporting the ALJ's decision because it was based on an inadequate hypothetical question, also is meritless.

William L. Standish
United States District Judge

Date: March 15, 2012